# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JUSTIN FLAKE,

                                Plaintiff,

      vs.

                                                9:12-CV-517

WASHINGTON COUNTY SHERIFF'S                     (MAD/ATB)
DEP'T, *et al.*,

                                Defendants.

---

JUSTIN FLAKE, Plaintiff *pro se*
GREGG T. JOHNSON, ESQ., Attorney for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).  In his civil rights complaint plaintiff alleged that, while he was incarcerated in the Washington County Jail ("WCJ") as a pretrial detainee, defendants used excessive force against him, confined him in unconstitutional conditions, denied him access to the law library, denied him his right to freely practice his religion, improperly searched his cell and deprived him of his property, denied him equal protection, filed false disciplinary reports against him, and denied him due process. (Compl.) (Dkt. No. 1).

After the court's initial review of the complaint, Judge Mae A. D'Agostino dismissed some of plaintiff's claims and ordered defendants to respond to the others.[1]

---

[1] Judge D'Agostino dismissed the complaint in its entirety as against defendants Trip and Breeyear and as against the Washington County Sheriff's Department. (Dkt. No. 7 at 19-20). She

(Dkt. No. 7).  There are three claims remaining in this action: (1) the use of excessive force on two occasions; (2) unconstitutional conditions of confinement; and (3) denial of the right to attend religious services on two occasions.[2] (*Id.* at 20).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 34).  Plaintiff has responded in opposition to the motion. (Dkt. No. 37).  Defendants have filed a reply. (Dkt. Nos. 40).  For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint in its entirety as against all remaining defendants.

# I.   Facts

## A.   Excessive Force[3]

### 1.   Cell Incident – November 10, 2010

Plaintiff states that he was incarcerated in the WCJ from July 17, 2010 until January 25, 2011.  Plaintiff states that on September 24, 2010, he was assigned to a cell in "B-Pod," where he remained until October 30, 2010. (Compl. at 19, ¶ 1).[4]  On

---

ordered the Clerk to replace the Washington County Sheriff's Department with Washington County in the caption. (Dkt. No. 7 at 6 n.3).

[2] Although Judge D'Agostino dismissed plaintiff's other claims without prejudice and with the opportunity to amend, (Dkt. No. 7 at 7 n.5), plaintiff did not attempt to file an amended complaint.  Rather, in his response to defendants' motion for summary judgment, plaintiff simply added the old claims back into his argument.  This is not sufficient to revive the dismissed claims.

[3] At his deposition, plaintiff was asked to identify which defendants were associated with each of plaintiff's remaining claims.  With respect to excessive force, plaintiff named defendants Elliott, Little, M. Minor, White, Tripp, and VanArnum. (Pl.'s Dep. at 93, 95-97, 99).  Although the complaint is clear that defendant Fisher participated in one of the incidents, at his deposition, plaintiff testified that he was not too sure why he sued Fisher. (*Id.* at 100).

[4] The court will cite to the complaint by its CM/ECF page number, together with the number that plaintiff has assigned to the paragraph on the page.  The reason for the double citation is that

October 30, 2010, plaintiff was moved to cell #11 in D-Pod ("D-11"),[5] and on November 4, 2010, he was moved to D-8. Plaintiff states that on November 4, 2010, he was told that he was being moved to make room for Protective Custody inmates. (*Id.*)

Plaintiff alleges that on November 10, 2010, he was asked to move back to cell D-11, but that he was concerned about this move because D-11 "was cold and there was no heat." (Compl. at 19, ¶ 2). Plaintiff claims that he asked Officer Tripp if he knew why plaintiff was being moved again, but Officer Tripp did not know the answer, and plaintiff asked to speak with a sergeant. (*Id.*) Plaintiff states that he made sure to tell Officer Tripp to let the Sergeant know that plaintiff was not "refusing" to move, he only wished to "discuss" the issue. Officer Tripp told plaintiff that a sergeant would be down to speak with him soon. (*Id.*)

Sergeant VanArnum came down to D-Pod with Officers Fisher and Elliot. Plaintiff states that when he tried to speak with defendant VanArnum, the defendant refused and told plaintiff to pack his things. (Compl. at 19, ¶ 3). Plaintiff began packing, while defendants VanArnum, Elliot, and Fisher all stood in his cell. (Compl. at 20, ¶ 3). Plaintiff states that he began moving his property to a table outside of the cell, but that it was crowded in his cell with all the defendants standing inside. Plaintiff states that on the fourth trip back into the cell from the table, he walked

---

plaintiff has numbered each claim beginning with paragraph 1. Thus, there are multiple paragraphs with the same number.

[5] For ease of identification, the court will refer to the cells with the letter identifying the "Pod" and then the number of the cell (i.e. "D-8" refers to cell number 8 in D-Pod).

between Sergeant VanArnum and Officer Elliot. (Compl. at 20, ¶ 4)  As plaintiff walked by Sergeant VanArnum, plaintiff's shoulder "did contact Sergeant VanArnum's arm." (*Id.*)

Plaintiff alleges that although the contact was "inadvertent," and occurred only because plaintiff had to squeeze in between the two officers, Sergeant VanArnum reacted by wrapping his arms around plaintiff's upper body, and Officer Elliot grabbed plaintiff's legs, pulling plaintiff down to the floor. (Compl. at 20, ¶ 6). Plaintiff states that as the defendants were trying to pull plaintiff down to the floor, he tried to "back out of the cell so that this could all be captured on video camera." (*Id.*) Officer Fisher pulled plaintiff back into the cell, and as he did, plaintiff turned, tripped over someone's foot, and fell to the ground, hitting his back on the "cell's seat." Sergeant VanArnum fell to the floor "at the same time," causing him extreme pain. Plaintiff alleges that Officer Elliot continued to hold his legs, while Officer Fisher held on to plaintiff's waist area.  Plaintiff claims that Sergeant VanArnum placed his knee on plaintiff's chest, his right hand holding plaintiff's forearm, and his left hand was placed on plaintiff's neck, causing plaintiff to choke. (*Id.*)

Plaintiff states that as the defendants held plaintiff down, Sergeant VanArnum told plaintiff that he was "tired of plaintiff submitting grievances and that plaintiff was going to follow the rules."  However, after they held plaintiff down for "a while," they told plaintiff they were going to let him up.  After he got up, plaintiff continued to move his property, without incident.  Plaintiff alleges that he asked Sergeant VanArnum if he could see a doctor because of his back injury, but defendant

VanArnum refused. However, another sergeant, who came on duty for the next shift, escorted plaintiff to the medical department. Plaintiff was examined and prescribed Ibuprofen and another medication that he could not remember. (Compl. at 20-21, ¶¶ 7-8).

During plaintiff's deposition, he testified that he mistakenly bumped into Sergeant VanArnum as plaintiff lowered his shoulder in an attempt to maneuver around the guards. Plaintiff stated that he tried to apologize, but that the defendants reacted before he was able to speak. (Pl.'s Dep. at 29, 33-34).[6] Plaintiff testified that as he was falling to the floor, he hit his back on the metal seat in the cell, and that Sergeant VanArnum fell on top of him. (Pl.'s Dep. at 29-30). At the deposition, plaintiff stated that after they fell, Sergeant VanArnum was holding plaintiff's neck so tightly that plaintiff felt like he was choking.[7] However, when plaintiff told the Sergeant that he was choking, the defendant let go immediately. (Pl.'s Dep. at 30). Plaintiff also admitted that he was swearing at the guards during the entire incident, and that he was squirming, but only because he needed to breathe, not because he was resisting. (Pl.'s Br. at 31-32). Plaintiff also testified that after the defendants told plaintiff to "calm down," they let him up, and he continued to move his belongings without further incident. (Pl.'s Dep. at 32).

Plaintiff testified that, although defendant VanArnum initially denied plaintiff's

---

[6] The citations are to the original page numbers at the top right-hand corner of the deposition pages. The pages are not all numbered consecutively because defendants filed only excerpts of the deposition.

[7] This detail was not in the complaint.

request to see the doctor after the incident, plaintiff ultimately waited only "a couple of hours" to get medical attention. When he did see the nurse, he told her that "he fell on stool hitting his back and was choked . . . ." (Def.s' Ex. M at 19) (Dkt. No. 34-14). There were "no bruises," just two "small scratches" on his neck, and no open areas or wounds. (*Id.*) He was prescribed Motrin. (*Id.*) On December 15, 2010, a doctor also prescribed Motrin for plaintiff's back pain. (*Id.* at 18). On December 17, 2010, plaintiff refused his Motrin. (*Id.* at 17).

Defendant VanArnum has submitted an affidavit in support of defendants' summary judgment motion. ("VanArnum Aff.") (Dkt. No. 34-30). Defendant VanArnum is a Corrections Sergeant, whose responsibility is maintaining the safety and security of both the inmates and the staff at WCJ. (VanArnum Aff. ¶ 2). In addition, defendant VanArnum is responsible for inmate movement and activities; making periodic rounds of assigned areas of the jail; conducting searches for contraband; overseeing WCJ's "internal grievance procedures;" and preparing reports as necessary. (*Id.*)

Defendant VanArnum's description of the incident is slightly different than plaintiff's, but has many of the same elements. Defendant VanArnum first points out that, because of plaintiff's bad behavior and unwillingness to follow facility rules, he spent most of his time in the Special Housing Unit ("SHU") at WCJ. (*Id.* ¶ 5). On November 10, 2010, Officer Tripp called Sergeant VanArnum to assist in moving plaintiff back to D-11. (*Id.* ¶ 6). Defendant VanArnum went to plaintiff's cell with Officers Elliot and Fisher. At that time, plaintiff told defendant VanArnum that he

6

wanted to stay in cell D-8, which had a view of the communal television.[8]

Defendant VanArnum stated that, after he gave plaintiff the opportunity to speak, he directed him to pack up his things and move to D-11, which incidentally did not have a view of the television. (*Id.*) Defendant VanArnum stated that, although he continued to move his property, plaintiff became increasingly loud and verbally combative. Plaintiff "intentionally" brushed up against defendant VanArnum's shoulder. Defendant VanArnum instructed plaintiff that if he did that again, the conduct would be viewed as a sign of aggression. Despite this warning, a few minutes later, plaintiff bumped into defendant VanArnum again. At that point, defendant VanArnum states that the officers brought plaintiff to the ground in a controlled manner. When plaintiff stated that he would comply with further orders, the officers let him stand under his own power. As plaintiff walked down to D-11, "he threatened to sue all WCJ staff present." (*Id.*)

Defendants Elliott and Fisher have also submitted affidavits in support of their motion. ("Elliott Aff.", "Fisher Aff.") (Dkt. Nos. 34-17, 34-18). Defendant Elliott stated that he witnessed plaintiff bump defendant VanArnum a second time after being told that a second bump would be considered an act of aggression. (Elliott Aff. ¶ 6). Defendant Elliott states that he does not recall seeing plaintiff hit his back on the stool, and he does not recall seeing defendant VanArnum with his knee on plaintiff's

---

[8] Plaintiff did not mention this detail either in his complaint or during the deposition. According to the plaintiff, his reason for wanting to stay in cell D-8 was that D-11 was too cold.

chest[9] or choking him.[10] (*Id.*)

Defendant Fisher's affidavit gives the same description of the November 10, 2010 incident as that given by defendants VanArnum and Elliott. (Fisher Aff.) (Dkt. No. 38-18). He states that plaintiff was brought to the floor in a "controlled manner." He also did not recall plaintiff hitting his back on a metal chair on the way to the floor, nor did he recall defendant VanArnum with his knee on plaintiff's chest or choking him. (Fisher Aff. ¶ 4) (Dkt. No. 34-18). After the officers gained control of plaintiff, and he agreed to comply with further orders, he gathered the rest of his belongings and moved to the new cell "under his own power and without further incident." (*Id.*) Defendant Fisher sustained an injured knee and had to seek medical attention as a result of the incident.

Defendant Fisher completed a report, contemporaneous to the incident. (Def.s' Ex. C at 10). In his report, defendant Fisher states that plaintiff bumped into defendant VanArnum after being told that a second bump would be considered an act of aggression "and responded to as such." (*Id.*) When plaintiff bumped into Sergeant VanArnum a second time, defendants Fisher and Elliott assisted in taking plaintiff to the ground, where they "gained control of the situation," and then "Sgt. VanArnum

---

[9] Plaintiff did not mention the knee on his chest during the deposition.

[10] Defendant Elliott also filed a contemporaneous report regarding the incident. (Def.s' Ex. C; Dkt. No. 34-4 at 11). In that report, defendant Elliott also noted that plaintiff had been told that his stay in D-8 would only be temporary, and that he would be moved back to D-11 after other inmates had been moved out. (*Id.*) This is consistent with the statement in the complaint that plaintiff was told that he was initially moved to D-8 "to make room for Protective Custody Inmates." (Compl. at 19, ¶ 1).

instructed [plaintiff] to get the remainder of his belongings out of cell 8." (*Id.*) Sergeant VanArnum instructed Officer Tripp to place plaintiff in Administrative Segregation in D-11. Defendant Fisher noted that plaintiff was placed into D-11 with no further incident, and that Fisher was going to be examined by medical personnel due to a knee injury sustained during the incident. (*Id.*)

## 2.  Law Library Incident – December 22, 2010

Plaintiff states that on December 22, 2010, he went to the Law Library at 9:30-10:00 a.m. (Compl. at 21, ¶ 9). When he arrived, he returned one book and asked if he could borrow a copy of the Jailhouse Lawyer Manual ("JLM"). Defendant Peck denied this request, and as a result, plaintiff asked defendant Peck to print out a section of the minimum standards for County Jails. (*Id.*) When defendant Peck complied with plaintiff's request, plaintiff took the page, and circled where it stated that inmates from SHU were allowed to borrow material from the law library. (Compl. at 21, ¶ 10; Pl.'s Dep. at 41). Plaintiff then handed the marked document back to defendant Peck in order to prove that plaintiff was correct. (*Id.*)

In the complaint, plaintiff alleged that he "asked [Peck] why he was denying plaintiff's request for the JLM." Plaintiff told Peck that he wished to speak with a sergeant. (Compl. at 21, ¶ 10). Sergeant Little arrived to speak with him. After plaintiff tried to explain to Sergeant Little that plaintiff should be able to take the book back to his cell, Sergeant Little said that she did not care what the rules said, because Officer Peck had determined that plaintiff could not have the book. (*Id.* ¶ 11). Sergeant Little also told plaintiff that his time in the library was "up" because Officer

Peck wanted plaintiff to go back to his housing unit. (*Id.* ¶¶ 11-12).

During his deposition, plaintiff testified that defendant Peck became angry when plaintiff showed him these "minimum standards," and Peck told plaintiff to pack up his things and go back to his cell. (Pl.'s Dep. at 42).  Plaintiff admitted that he "denied going back because [he] didn't do nothing [sic]." (*Id.*)  In the complaint, plaintiff alleged that he tried to explain to defendant Little that plaintiff had just arrived and "shouldn't be going back [to his cell]."  Defendant Little then "pushed the pin," and Officer M. Minor and T. White responded.[11] (Compl. at 22, ¶ 12).  In the complaint, plaintiff alleges that Officer Peck "forced" plaintiff's hands into the handcuffs, and Sergeant Little ordered plaintiff back to his cell. (Compl. at 21-22, ¶ 12).  Plaintiff states that he "protested" because he needed his library time, however, Officer White forced plaintiff up out of his seat.[12] (Compl. ¶ 13; Pl.'s Dep. at 42).

Plaintiff claims that the officers forced him to walk faster than he could with the "ankle brace,"[13] and that he fell because of that.  In the complaint, plaintiff alleges that defendants White and Minor picked plaintiff up and carried him the rest of the way to

---

[11] Defendant Jansson was the third officer who arrived at the law library and was involved in carrying plaintiff back to his cell. (Jansson Aff. ¶ 3) (Dkt. No. 34-22).  The complaint does not mention this defendant in its description of the law library incident.

[12] During his deposition, plaintiff testified that when Officer Peck refused to allow plaintiff to borrow the JLM, plaintiff left Peck's office and went back to sit down at the computer to look up more cases, and it was then that Peck came out of his office, and the other officers arrived to help take plaintiff back to his cell. (Pl.'s Dep. at 54).  The exact details of the incident regarding who showed up and when are not material.  All parties agree that plaintiff argued about going back to his cell, and defendant Little called the rover guards to assist her in getting plaintiff back to his unit.

[13] Plaintiff never mentions anyone putting ankle restraints on him, and there is no indication that he had ankle restraints on prior to the arrival of the other officers.

his cell. During his deposition, plaintiff testified that they "basically drag me a little bit . . . [a]nd they pick me up in the hallway," carrying him all the way back to his cell. (Compl. ¶ 13; Pl.'s Dep. at 42). During his deposition, plaintiff admitted that he was cursing at the officers when they were carrying him back to the cell. (Pl.'s Dep. at 56).

When they got back to his cell, the officers propped plaintiff up with his face against the bars, and Officer White forced his forearm into plaintiff's neck while they took off his shackles. (Compl. at 22, ¶¶ 13-14; Pl.'s Dep. at 43). In the complaint, plaintiff stated that he tried to move his head because the bars were hurting his face. (Compl. at 22, ¶14). Plaintiff testified that defendant White had his "left arm on the top of my back," and that he punched plaintiff "one good time" in the lower back with his right hand. (Pl.'s Dep. at 43). Plaintiff asked Sergeant Little if she saw "that," but she told him she did not notice the blow.[14] (*Id.*) Plaintiff asked to go the medical department, and the nurse came to see him an hour later.[15] (*Id.* at 44). Plaintiff claims that he was in extreme pain, but he had no bruises on his back from the alleged punch. (*Id.*) Plaintiff alleged that the punch aggravated the injury that he received on November 10, 2010. (Compl. at 22, ¶ 16).

Again, defendants' version of what happened is slightly different than plaintiff's explanation. When defendant Peck refused to allow plaintiff to take the

---

[14] During his deposition, after denying that he called Sergeant Little a "fat slob" and Officer Minor a "bitch with a badge," plaintiff admitted that he called Officer White a "faggot" and an "A hole." (Pl.'s Dep. at 57-58).

[15] In the complaint, plaintiff states that about ***10-15 minutes*** after he was locked in, Officers Minor, White and Little came to his cell with a nurse so that plaintiff could be examined. (Compl. ¶ 15).

JLM out of the library, plaintiff became combative and asked to speak with a Sergeant. (Peck Aff. ¶ 5). Defendant Little arrived and informed plaintiff that he would not be able to borrow the book. Plaintiff became loud, and defendants Peck and Little asked plaintiff to leave the library, but he refused. (*Id.*) Defendant Little then called three corrections officers, known as "rovers" for assistance. Officers White, M. Minor,[16] and Jansson arrived to assist. Plaintiff sat in a chair and refused to move. Defendant Peck stated that he placed one handcuff on plaintiff while plaintiff held onto the chair. The officers lifted plaintiff to his feet, but he went limp, dropped to the ground, and refused to move, so they had to carry him out of the library. (*Id.*) Defendant Peck did not see what happened after they left the library because he could not leave his post. (*Id.*)

Defendant White stated in his affidavit that he heard plaintiff say that the officers were going to have to use force to get him to leave. (White Aff. ¶ 7) (Dkt. No. 3). The plaintiff was lifted out of his chair, but willfully dropped to the ground on his stomach. The officers carried plaintiff back to his cell. When they arrived at the cell, plaintiff was ordered to face the wall so that his restraints could be removed, but plaintiff suddenly jerked his head back in an attempt to strike defendant White. (*Id.*) In response, defendant White placed his forearm to the back of the plaintiff's head to prevent injury. When plaintiff's handcuffs were eventually removed, he refused orders to enter his cell and held onto the "cage" near his cell. Plaintiff was "removed" from the cage and placed in his cell. However, once he was in the cell, he removed his

---

[16] Defendant "M." Minor is a female officer (Michele).

shirt and charged toward defendant White, while continuing to threaten all the officers. Defendant White states that he never struck or punched plaintiff during this incident. (*Id.*)

Defendant Little has also filed her affidavit in support of summary judgment, describing the law library incident. (Little Aff.) (Dkt. No. 34-24). She stated that when she arrived at the law library, plaintiff was agitated and would not listen to the officers. (Little Aff. ¶ 5). Defendant Little stated that, after defendant Peck placed one handcuff on plaintiff's wrist, she placed the handcuff on plaintiff's other wrist. Plaintiff began to scream "'*use of force! use of force*!'" (*Id.*) (italics in original). When plaintiff continued to resist, defendant Little called the rovers. Plaintiff was verbally combative with the officers. Officers White and M. Minor lifted plaintiff out of his chair, but after a few steps, plaintiff intentionally dropped to the ground. Officers White and Minor then lifted plaintiff from under each shoulder while Officer Jansson lifted plaintiff's legs and carried him back to the cell, with Officer Little following them. When they arrived at plaintiff's cell, he continued to be verbally abusive, and he was placed facing the wall, where his restraints were removed. He then refused to walk into his cell and held onto the cage. He was removed from the cage and placed into his cell by the officers, but took off his shirt, and turned toward Officer White, threatening to "'*fuck him up.*'" (*Id.*) (italics in original). Defendant Little states that she never saw Officer White strike plaintiff. (*Id.*)

In her affidavit, defendant Rivers/Schuyler[17] states that she was monitoring the control room on December 22, 2010 and witnessed plaintiff's escort from the law library to his cell. (Rivers/Schuyler Aff. ¶ 4). The defendant states that she never saw the staff use more force than minimally necessary to physically restrain plaintiff, and that she did not see defendant White strike plaintiff as he claims. (*Id.*)

After the law library incident on December 22, 2010, plaintiff complained of back pain again and was seen by the nurse. (*Id.* at 16). On January 3, 2011, plaintiff was examined by a physician, who noted some lower back tenderness, but negative straight leg raising and intact deep tendon reflexes. (*Id.* at 14). The doctor prescribed Motrin and Flexeril, but stated that he did not believe that any additional medication or a second mattress was indicated. (*Id.* at 10-11, 14) At his deposition, plaintiff testified that he was still taking medication for his back two years later. (Pl.'s Dep. at 36-37).

## B. Conditions of Confinement[18]

Plaintiff alleges that from November 10, 2010, until he left WCJ in January of 2011, his cell was "extremely cold." (Compl. at 22-23, ¶¶ 1-4). Plaintiff alleges that

---

[17] This defendant "A. Rivers" has submitted an affidavit explaining that her name is now "Schuyler," and that Rivers is her maiden name. (Schuyler Aff. ¶ 1) (Dkt. No. 34-29).

[18] Plaintiff testified at his deposition that the defendants associated with the unconstitutional conditions of confinement were: Officers Jackson and Sergeant Lascar. (Pl.'s Dep. at 101, 104). His complaint indicates that he was denied the shower by Officer Rivers/Schuyler and Sergeant VanArnum. (Compl. at 28, ¶ 8 (top of page)). The complaint also alleges that the individuals responsible for denying him extra blankets were: Officers Jackson, R. Minor, M. Minor; A. Rivers, and Sergeants Dougherty, Jamieson (plaintiff misspelled this defendant's name, but the court will refer to him by the correct spelling – "Jamieson"), and Lascar.

the clothing that he was provided was insufficient to keep him warm, and that it was impossible for him to write, do legal work, and sleep. (Compl. at 23, ¶ 2). Plaintiff stated that even if he bundled up in all the clothing that he had, it was still not sufficient to keep him warm. (*Id.*) Plaintiff claims that he requested heat and extra blankets "several times a day from November 10, 2011 until . . . January 25, 2011." (Compl. at 23, ¶ 3). Plaintiff states that he filed two grievances, one on November 11, 2010, and another on December 6, 2010, but was unable to obtain relief. (Compl. at 22, 23, ¶¶ 1, 4).

Plaintiff also alleges that on December 14, 2010, Sergeant Jamieson told plaintiff that he would be moving from SHU C-6 to SHU C-10. (Compl. at 26, ¶ 1 (bottom of page)). When plaintiff returned from the barber shop, his property had already been moved, and when plaintiff was escorted to C-10, he noticed that his belongings were all on the "dirty" floor. The cell was extremely dirty, there were urine and feces stains around the toilet and sink, and the mattress was soiled. Plaintiff states that he asked Sergeant Jamieson and Officer Jackson whether plaintiff could clean his cell, but the Sergeant refused. (*Id.*)

Plaintiff alleges that after Sergeant Jamieson and Officer Jackson refused to allow plaintiff to clean his cell, the Sergeant turned the water off to plaintiff's sink and toilet. (Compl. at 27, ¶ 2). Plaintiff alleges that he filed a grievance on December 17. He asked for his water to be turned on again on December 18, but his request was denied. (Compl. at 27, ¶ 3). Plaintiff also claims that he was denied his personal property during this period of time, including his legal work, and re-alleges that this

15

cell was cold.[19]  Plaintiff claims that the water to his toilet and sink was turned off for

8 days, and that when he reminded Sergeant Jamieson, the sergeant said "well, too

bad." (Compl. at 27, ¶ 4).  Plaintiff states that he filed grievances on December 20 and

27, 2010 because his water had been off since December 14, 2010. (Compl. at 27, ¶ 5).

Plaintiff also alleges that he filed another grievance on December 28, 2010 because he

was denied a blanket by "jail officials on the 8am-3pm shift . . . ." (Compl. at 27, ¶ 6).

During his deposition, plaintiff first testified that the water was off for two weeks.

(Pl.'s Dep. at 62).  However, plaintiff then conceded that the water was turned on

occasionally so that he could flush the toilet, but he maintained that he did not "drink"

for a couple of weeks. (Pl.'s Dep. at 63).

    Defendants added some pertinent facts to the issue of plaintiff's water and cell

location.  In a statement submitted to the Commission on Correction after the appeal

of one of plaintiff's grievances, defendant Lascar stated that on December 11, 2010,

plaintiff, while still in C-6, began a "screaming match" with an inmate from the

minimum security dormitory. (Def.'s Ex. H at 14) (Dkt. No. 34-9).  Defendant Lascar

resolved the situation, but on December 12, 2010, he received another call, stating that

plaintiff had flooded his cell and was in the process of flooding the hallway by filling

cups of water and throwing them under the cell door. (Def.'s Ex. I at 4) (Dkt. No. 34-

10).

    Defendant Lascar and defendant Breeyear went to plaintiff's cell, and defendant

---

[19] The court notes that any personal property and access to court claims were dismissed by
Judge D'Agostino.

16

Breenyear turned off the water. Officer Bump applied hand restraints on plaintiff and brought him outside the cell while defendants Lascar and Breeyear put his belongings in plastic bags so they would not get wet.[20] (*Id.*) Plaintiff was told that after he mopped and dried the area, he would get his property back. (*Id.*) While plaintiff initially agreed, he suddenly began to insist on the return of his property and getting the water turned on. When defendant Elliott attempted to reason with plaintiff, he tipped an entire bucket of water over onto the floor. Plaintiff ultimately got his property back later the same day. (*Id.*)

On December 14, 2010, plaintiff began shouting at the minimum security inmates again, creating another disturbance. (Jackson Aff. ¶ 5) (Dkt. No. 34-20). It was decided that plaintiff would be moved away from the inmates with whom he was arguing. (*Id.*) Plaintiff's property was moved while plaintiff was out of the cell, getting his hair cut. When plaintiff was escorted to the new cell (C-10), he requested a spray bottle with cleanser, but defendant Jackson observed that the cell was clean and denied the request. (*Id.*) Defendant Jackson stated that at approximately 10:45 p.m., he noticed water running into the hall in front of plaintiff's cell. Plaintiff had plugged his toilet and flooded his cell. Defendant Jackson contacted Sergeant Jamieson, who ordered the plaintiff's water be temporarily turned off at 10:50 p.m. (*Id.*)

Plaintiff claims that on December 15, 2010, he was denied a shower by Officer A. Rivers/Schuyler. Plaintiff claims that defendant Rivers/Schuyler told plaintiff that

---

[20] Plaintiff subsequently filed a grievance complaining about the deprivation of his property during this incident.

he was being refused a shower because Sergeant VanArnum informed her that "plaintiff does not get anything while plaintiff is in SHU." (Compl. at 28, ¶ 1 (top of page)). Plaintiff claims that he told defendant Rivers/Schuyler that he had not had a shower in four days. (Compl. at 28, ¶ 2 (top of page)). During his deposition, plaintiff stated that he was not denied a shower "too many times,"[21] and that he was aware that in order to get a shower, he was required to ask at the appropriate time. (Pl.'s Dep. at 66-67). He maintained that he asked for a shower properly, but was still denied. (*Id.*) Defendant Rivers/Schuyler states in her affidavit that she has no specific recollection of denying plaintiff a shower, but notes that it was her practice to afford all inmates a shower, who made their requests by 8:00 a.m. (Rivers/Schuyler Aff. ¶ 3).

## C.    Religious Services

Plaintiff claims that on December 19, 2010, he was denied the opportunity to attend Bible Study by Officer Neil Hafner. (Compl. at 28, ¶ 1 (bottom of page)). On January 8, 2011, plaintiff was allegedly denied the right to attend his religious service by Officer Richard Minor.[22] (Compl. at 28, ¶ 2 (bottom of page)). Plaintiff states that defendant R. Minor told him that "religious service is considered a program," and therefore, he did not have to let plaintiff attend. (*Id.*) Plaintiff asked to speak with a Sergeant, and defendant Minor called Sergeant Lascar, who also told plaintiff that "religious service" was considered a program, and he was not required to let plaintiff

---

[21] The complaint only alleges the denial of a shower on one date by two defendants. (Compl. at 28, ¶ 1 (top of page)).

[22] This is a different "Minor" that the defendant discussed above. M. Minor is Officer Michele Minor, and R. Minor is Officer Richard Minor.

18

attend. (Compl. at 28, ¶ 3 (bottom of page)).

Defendant Hafner states in his affidavit that he does not "have a specific recollection" of denying plaintiff the ability to attend Bible Study. (Hafner Aff. ¶ 5). However, defendant Hafner states that plaintiff intentionally ignored numerous orders and announcements for a number of programs, only later to request to attend them. (*Id.*)  In those circumstances, plaintiff was denied attendance because of his late responses.  He was instructed that in order to attend any of the WCJ programs, including Bible Study, he would have to promptly respond to the CO's request for participation.  Defendant states that after plaintiff was denied access to the programs, he would threaten to file a lawsuit for discrimination, leading defendant to believe that plaintiff was acting intentionally to fabricate legal claims. (*Id.*)

Plaintiff filed grievances regarding all of his claims, and defendants have filed those grievances as exhibits, together with any appeals taken by plaintiff.  The court notes that the final step in the grievance process for WCJ was to send the grievance to the Citizens' Policy and Complaint Review Council ("CPCRC").  In several of plaintiff's appeals, the CPCRC requested that the WCJ submit further evidence in support of its denial.  The CPCRC letters and the evidence submitted in response to those letters have also been filed with defendants' exhibits.  In all but one case, after reviewing the additional evidence, the CPCRC sustained the denial of the plaintiff's grievances.

## II.    **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of

19

material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## III. <u>Excessive Force</u>

### A. **Legal Standards**

Although the parties have analyzed the excessive force and the conditions of

confinement issues under the Eighth Amendment, plaintiff was a pretrial detained while he was incarcerated in WCJ. The right of a pretrial detainee to be free from excessive force *amounting to punishment*, is protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which relates only to convicted prisoners. *Murray v. Johnson No. 260*, 367 F. App'x 196, 198 (2d Cir. 2010); *Vazquez v. Curcione*, No. 11-CV-443, 2013 WL 5408858, at *3 (W.D.N.Y. Sept. 25, 2013) (citing inter alia *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)).

Even though pretrial detainees are protected by Due Process, the Second Circuit has equated the legal standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment with the standard used to analyze convicted inmates' Eighth Amendment claims. *Id.* (citing *United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999)). The Second Circuit has held that a pretrial detainee may also set forth a constitutional due process violation by showing that the defendants conduct constituted "pre-conviction 'punishment' or involved an 'intent to punish.'" *Id.* (quoting *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001)).

In *Murray v. Johnson*, the Second Circuit stated that the due process inquiry is articulated in the excessive force analysis under the Eighth Amendment in *Hudson v. McMillian*, 503 U.S. 1 (1992). *Id.* *Hudson* provides that both an objective and a subjective element must be satisfied to establish an excessive force claim. *Id.* at 49. To satisfy the objective element, the plaintiff must show that the resulting harm or deprivation was sufficiently serious. *Id.* (citing *Walsh*, 194 F.3d at 50). With respect to this element, the law is clear that "a claim of excessive force may be established

even if the victim does not suffer 'serious' . . . or 'significant' injury, . . . provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *Walsh*, 194 F.3d at 47-48 (quoting *Hudson*, 503 U.S. at 7-10) (citations omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### B. Application

#### 1. Cell Incident – November 10, 2010

After considering plaintiff's deposition, the affidavits of all the defendants involved, the exhibits, and the five factors outlined in *Hudson, supra*, this court finds that no rational jury could find that defendants used excessive force during the November 10, 2010 incident. There are no genuine issues of material fact in dispute. With respect to the defendants' mental state, they allege that plaintiff bumped

defendant VanArnum twice with his shoulder and was warned after the first bump that a second bump would be considered "aggression." (VanArnum Aff. ¶ 5; Elliott Aff. ¶ 6). Plaintiff stated in his complaint, and admitted at his deposition, that he bumped defendant VanArnum, even though he claims he only accidentally bumped the defendant once. (Compl. at 20, ¶ 4). Plaintiff admittedly was unhappy about being directed to move back to a cell that he did not like. He admits that he initially questioned the move. (Compl. at 19, ¶ 2). Even if defendant VanArnum mistook plaintiff's initial bump as being aggressive,[23] given plaintiff's initial expression of displeasure at moving to another cell and his history of difficult behavior,[24] the resulting conduct was justified because defendant VanArnum "reasonably" perceived a threat, and defendants wanted to prevent any potentially violent conduct by plaintiff.

Defendants' perception is further justified by plaintiff's statement that, as defendants were trying to take him to the floor, he was trying to back out of the cell so that the incident would be "captured" on video. (Compl. at 20, ¶ 6). Plaintiff states that defendant Fisher pulled plaintiff back into the cell. (*Id.*) The defendants could

---

[23] Plaintiff stated that his shoulder was lowered in order to maneuver around defendant VanArnum, due to the size of the cell, however, the lowering of plaintiff's shoulder could also have been interpreted as an aggressive posture.

[24] Defendant Gene McKenna, the WCJ administrator has submitted an affidavit, in which he states that plaintiff spent most of his time in SHU while incarcerated in WCJ. (McKenna Aff. ¶ 5) (Dkt. No. 34-25). Defendant McKenna indicates that the disciplinary infractions causing plaintiff's confinement to SHU included numerous counts of disobeying staff; numerous counts of insolence toward corrections officers; numerous counts of disruptive conduct; numerous counts of making threats toward others; and numerous counts of engaging in violence or threats of violence. (*Id.*) Plaintiff also admitted that he had many disciplinary problems, and that he was ultimately transferred to Mid-State SHU because he had too many disciplinary tickets. (Pl.'s Dep. at 105).

reasonably have perceived plaintiff's conduct in trying to back out of the cell as resistance, or worse, as an attempt to escape the officers. Plaintiff then states that as he was being pulled back into the cell, he

> turned and ***fell on someone's foot***, and fell to the floor. As plaintiff fell, plaintiff struck his back on the cell's seat, Sergeant VanArnum fell to the floor also at the same time, causing plaintiff extreme pain.

(*Id.*) (emphasis added). Plaintiff claims that the defendants did not wait for him to apologize after he bumped into defendant VanArnum, however, given the perceived threat, the defendants would not have been unreasonable in failing to wait for plaintiff to "apologize," as he later claimed that he intended to do.[25]

With respect to the amount of force used, defendants state that the extent of the force was only enough to bring plaintiff to the floor in an effort to gain control of a potentially violent situation. Plaintiff states that the defendants "took him" to the floor, but also claims to have tripped over someone's foot on the way down. Plaintiff alleges that after he and defendant VanArnum fell, defendant VanArnum placed his knee on plaintiff's chest and placed his hand on plaintiff's neck, causing him to choke. (*Id.*) Defendant Elliott and Fisher do not recall seeing defendant VanArnum with his knee on plaintiff's chest or his hand on plaintiff's neck. (Elliott Aff. ¶ 5; Fisher Aff. ¶ 4). Even assuming that somehow when defendant VanArnum fell, he hit plaintiff with his knee or his hand went to his neck, plaintiff admitted at his deposition, that

---

[25] This is assuming that plaintiff only bumped defendant VanArnum once as plaintiff claims. The court is making no such finding as all the evidence generated contemporaneously to the incident supports the defendants allegation that plaintiff bumped defendant VanArnum twice.

when he told defendant VanArnum that he was choking, the defendant let plaintiff go.

Plaintiff also admitted struggling and cursing at the officers, but that when he calmed down, he was let up off the floor and continued moving his belongings without further incident. Defendants Elliott and Fisher were only alleged to have held plaintiff as he fell. Thus, all the evidence suggests that the defendants used only the amount of force necessary to take plaintiff to the ground and only to maintain order.[26] They did not maliciously intend to harm the plaintiff, and they ceased any use of force when plaintiff agreed to calm down.

While plaintiff still claimed that he was denied the opportunity to see the nurse immediately, he admitted that he was examined within a few hours of the incident, and that, other than his alleged back pain, and some alleged "throat" pain, there were no bruises or other injuries sustained as a result of the incident. The medical examination showed two scratches on plaintiff's neck, and no bruises on his back or his body. He was prescribed Motrin and later, Flexiril. By his own admission, plaintiff's back injury, or the exacerbation of his pre-existing back injury,[27] was caused by striking the chair on the way down to the floor in what he admits was a small cell, not by defendants' allegedly "malicious" conduct.[28] Defendant Fisher suffered a knee injury

---

[26] Defendant VanArnum's warning to plaintiff was clearly an effort to avoid the use of any force at all.

[27] The medical records indicate that plaintiff complained of "recurrent back pain" when he was admitted to the facility in July of 2010, contrary to plaintiff's allegation that he never had back pain before the November 10, 2010 incident. (Def.s' Ex. M at 8, 15) (Dkt. No. 34-14).

[28] During his deposition, he stated that he "inadvertently" hit the stool. (Pl.'s Dep. at 83).

as a result of the incident.

As this incident is described by the defendants, they were simply responding to what they believed was an aggressive act by plaintiff, and they applied the force necessary to maintain order. At worst, even assuming many of the facts as alleged by plaintiff, the defendants' actions could be considered negligent.[29] A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. *Daniels v. Williams*, 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a Section 1983 claim). *See also Epps v. City of Schenectady*, 1:10-CV-1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham*, 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick*, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)). Thus, plaintiff's claim of excessive force on November 10, 2010 may be dismissed.

## 2.     Law Library Incident – December 22, 2010

Plaintiff's argumentative nature precipitated the law library incident, and the same analysis applies as that used for the November 10, 2010 incident. Plaintiff was told that he had to leave the law library, even though his time was not up. Plaintiff

---

[29] None of the defendants recall plaintiff hitting the chair on the way to the floor, and defendant VanArnum states that he did not put his knee on plaintiff's chest. The court is not making any factual finding, nor do I need to make any factual finding regarding the details of the fall.

admits arguing with defendant Peck about whether plaintiff could bring the JLM back to his cell, causing defendant Peck to call Sergeant Little.[30] When plaintiff became disruptive, defendant Little called for the "rovers" to help escort plaintiff back to his housing unit.

Defendants allege that plaintiff refused to move, and then he intentionally dropped to the ground when the defendants tried to stand him up, while plaintiff claims that he tripped because the defendants made him walk too fast with leg restraints. There is no issue of excessive force at the beginning of the incident. The fact that plaintiff was "dragged" a short distance and then carried back to his cell also does not rise to the level of excessive force. The defendants' conduct in dragging/carrying plaintiff was directly related to plaintiff's actions and was no more forceful than necessary to get him back to his cell.[31]

Plaintiff alleges that when he and defendants White, Little, M. Minor, and Jannson arrived at his cell, defendant White stood plaintiff up with his face against the bars in order to take off the handcuffs. While plaintiff states that defendant White gave him "a little stiff punch in the back," defendant White states that plaintiff

---

[30] Whether defendants Peck was incorrect about the JLM or whether the defendants were incorrect in forcing plaintiff to go back to his cell is not relevant. An inmate is required to follow officers' orders regardless of whether the inmate may believe that he is correct and the officers are wrong.

[31] During his deposition, plaintiff stated that the "dragging and carrying was the force used," but it was not "that long," only 3-5 feet, and he was not injured by the dragging. (Pl.'s Dep. at 80-81). Plaintiff also admitted that the defendants "took" plaintiff's actions "as me just trying to like sit down or lay down. Like come on." (*Id.* at 56). He also stated that, while he was not struggling or resisting, he was cursing at the defendants and telling them to "get the F off me." (*Id.*)

snapped his head back, and White had to place his forearm against plaintiff's head while he was removing the handcuffs so that neither White, nor another officer, would be injured. (White Aff. ¶ 7). White denies punching plaintiff in any way, and defendant Little stated that she did not see defendant White strike plaintiff. Defendant Rivers/Schuyler, who was not involved in this incident states that she was monitoring the control room on December 22 and witnessed plaintiff's escort from the law library to his holding cell, but never saw defendant White strike or punch plaintiff. (Rivers/Schuyler Aff ¶ 4).

In *Vasquez v. Curcione*, No. 11-CV-443, 2013 WL 5408858, at *4-5 (W.D.N.Y. Sept. 25, 2013), plaintiff, also a pretrial detainee, refused to leave the visitation room when directed to do so by the defendants. *Id.* at *2. In light of the plaintiff's refusal to leave the area, the court found that the defendants were required to use reasonable force to remove plaintiff. *Id.* at *4. Plaintiff suffered moderate bruising and a "hurt back" as a result of the defendants' conduct, but the court found that these injuries were "de minimis" and did not result in anything more than short-term pain. *Id.* at *5. The court also found that plaintiff had not articulated facts from which it could be concluded that the force used by the defendants was gratuitous.[32] *Id.* at *5. The court

---

[32] The court recognized that less serious injuries could support a claim of excessive force where the force used was excessive and gratuitous. *Vazquez,* 2013 WL 5408858, at *4 (citing *Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. March 8, 2011) (twisting of plaintiff's thumbs was entirely gratuitous); *Davenport v. County of Suffolk*, No. 99-CV-3088, 2007 WL 608125, at *11 (E.D.N.Y. Feb. 23, 2007) (denying summary judgment where defendant allegedly hit plaintiff's head against the car intentionally and unnecessarily); *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (an inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury).

granted summary judgment for the defendants on the excessive force claim.

In this case, in plaintiff's memorandum in opposition to defendant summary judgment motion, he has now embellished his allegations to include "shoving, punching, and swinging," but does not indicate to which alleged excessive force incident he is referring. (Pl.'s Mem. at 6) (Dkt. No. 37).  Plaintiff never mentioned these actions in his complaint, or more importantly, during his deposition when he had the opportunity to testify regarding these incidents and was questioned closely about the actions taken by defendant White.  Although plaintiff now states that he received medical treatment from the facility which would specifically show that he was "attacked" by the officers at WCJ, he never alleged an "attack" by officers, and a review of the medical evidence shows that plaintiff had no bruises, some small scratches and was prescribed medication for back pain that could have been exacerbated by falling to the floor during the first incident. (*See* Def.s' Ex. M at 8 (report of "recurrent back pain" on admission to WCJ), 10-11 (prescriptions), 19 (nurses' notes of the 11/10/10 incident)).

The only part of plaintiff's factual statement and deposition testimony that could even approach "gratuitous" conduct, as the term was used in *Vasquez*, is the allegation that defendant White gave plaintiff "a little stiff punch" in the lower part of his back.[33]  The rest of the evidence and plaintiff's inconsistent statements about the

---

[33] The court notes that both plaintiff and defendant White state that White's left forearm was against plaintiff's head.  While plaintiff alleges that White gave him a stiff little punch with his right hand, it is clear that defendant White was assisting the other officers in the removal of the handcuffs. The hand cuffs would probably have been at the level of plaintiff's low back.  Thus, it is possible that plaintiff felt pressure in that area while defendants were trying to remove the handcuffs so that

incident negates any suggestion that defendant White "punched" plaintiff. No reasonable fact finder could conclude that defendant White used force beyond that necessary to hold plaintiff's head still while plaintiff's handcuffs were being removed in order to prevent injury to himself and/or another officer. Defendants' actions show that they did not act maliciously or sadistically to cause plaintiff harm, but that they took actions that were directly related to plaintiff's behavior, using only force that was necessary to get plaintiff back to, and then into, his cell.[34] Plaintiff's excessive force claims may be dismissed.[35]

---

plaintiff could be locked back in his cell. Defendant Jansson made a statement in connection with the disciplinary charges against plaintiff resulting from this incident. Defendant Jansson states that he was the officer who began to take the restraints off plaintiff, but that plaintiff was "resisting," and plaintiff was "restrained" by officers White and Minor, while defendant Jansson finished removing his restraints. (Def.s' Ex. B at 40). Sergeant Little and Officer White also made a statement in connection with the disciplinary charges. (*Id.* at 41, 42). The defendants all noted in their statements that plaintiff was verbally abusive during this incident and told defendant White that plaintiff would "'fuck him up.'" (*See id.* at 41, 44).

[34] Finally, defendant McKenna points out that when plaintiff appealed the grievance relating to the law library incident, the New York State Commission of Correction Citizens Policy and Complaint Review Council ("CPCRC") viewed video evidence of the incident, but found that it did not substantiate plaintiff's claims. The CPCRC requested the video taped evidence. (Def.s' Ex. D at 9 (letter from CPCRC requesting additional evidence regarding the incident)). That video taped evidence has not been found. (*See* McKenna Aff. ¶ 7; Def.'s Ex. D at 21 (affirmation of denial of grievance), 22 (letter from counsel for the Commission on Correction, stating that the Commission did receive copies of the video footage, but "[u]nfortunately, said copies have since been lost or misplaced and are no longer maintained in the Commission's files.")). The absence of the video footage does not change this court's findings because plaintiff's allegation of excessive force is contradicted by all the evidence, including his own statements. The court also notes that in *McKinney v. Dzurenda*, No. 13-1901, 2014 WL 642572, at *1 (2d Cir. Feb. 20, 2014), the Second Circuit reaffirmed the holding that when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no jury could possibly believe it, the court should not adopt that version for purposes of ruling on a motion for summary judgment.

[35] The court would point out that plaintiff only alleges that defendant White used any force on him during the law library incident. Defendant Peck did not leave the law library and was not present for the alleged "punch." Defendant Little states that she did not see White strike plaintiff, and

## IV.   Conditions of Confinement

### A.    Legal Standards

As stated above, plaintiff was a pretrial detainee at the time of the incidents in this case.  As such, he was protected from unconstitutional living conditions by the Due Process Clause of the Fourteenth Amendment, but the standards for his due process protection are the same as those that protect convicted inmates from Cruel and Unusual Punishment under the 8th Amendment. *LaRock v. Amato*, No. 9:12-CV-503, 2013 WL 5466410, at *9 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  Prison officials "must 'take reasonable measures to guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).  To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  *See Farmer*, 511 U.S. at 834.

---

plaintiff testified that M. Minor never used any force during the incident. (Pl.'s Dep. at 94).  Plaintiff never mentioned the third rover.  In order for any officers present at the use of force to be held liable for "failure to intervene," they would have to have had the opportunity to stop the unconstitutional conduct.  If at worst plaintiff alleges one "little" punch, none of the other officers would have had the opportunity to stop that conduct because it was over as soon as it happened.  Thus, even if the case were to proceed on the law library incident, it would proceed only as against defendant White.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*.

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Carlson v. Parry*, No. 06-CV-6621, 2012 U.S. Dist. LEXIS 44292, at *20–21, 2012 WL 1067866 (W.D.N.Y. March 29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the

part of the defendant[] sufficient to satisfy the subjective component of the deliberate-indifference standard. *Id.* (citing *Farmer*, 511 U.S. at 842; *Proffitt v. Ridgeway*, 279 F.3d 503, 506 (7th Cir. 2002); *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett*, 379 F.3d at 465 (citing *Fruit v. Norris*, 905 F.2d 1147, 1150–51 (8th Cir. 1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

A plaintiff fails to state a valid Eighth Amendment claim when he does not allege that defendant was personally aware of a dangerous condition or that defendant was deliberately indifferent to the alleged conditions. *Spencer v. Sylvester*, No. 97-CV-5491, 1999 U.S. Dist. LEXIS 1098, at *8–9, 1999 WL 61644 (E.D.N.Y. Feb 2, 1999) (Eighth Amendment claim was dismissed when plaintiff did not allege

defendant was personally aware of slippery conditions on stairs or that the defendant was deliberately indifferent to the conditions).  A plaintiff states a claim where he alleges that he informed the defendant of a dangerous condition and the defendant ordered plaintiff to ignore it.  *See Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (inmate who fell off a ladder during a work assignment stated an Eighth Amendment claim when a defendant correction officer ordered plaintiff to continue working on the latter after being informed that the ladder was unsafe); *see also Baumann v. Walsh*, 36 F. Supp. 2d 508, 513–15 (N.D.N.Y. 1999) (differing accounts as to whether defendant had notice of an unsafe work condition and whether a ladder was available for plaintiff to use created genuine issues of fact that defeated defendants' motion for summary judgment).

## B.      Application

Plaintiff alleges that he was housed in unconstitutional conditions because defendants moved him back to D-11, which was "extremely" cold, and he was denied an extra blanket.  Plaintiff also claims that he was denied a shower once, and that on December 14, 2010, he was moved from SHU C-6 to C-10 that was cold and "extremely dirty," but was denied cleaning supplies. (Compl. ¶ 1 at 26).  Plaintiff alleges that after Sergeant Jamieson refused to give plaintiff cleaning supplies, he turned off the water to plaintiff's sink and toilet.  At one point, plaintiff alleged that he was without water for two weeks.

### 1.      Cell Conditions

Plaintiff claims that cell D-11 was extremely cold, and that he was denied an

extra blanket. Plaintiff filed at least three grievances regarding the temperature in his cell. (Def.'s Exs. E-G). The first grievance was filed the day after plaintiff was moved from D-8 **back to** D-11 on November 10, 2010.[36] (Def.s' Ex. E at 2) (Dkt. No. 34-6). The grievance was investigated, and denied after the maintenance department checked and determined that the temperature in D-11 was "adequate" and "within normal limits." (*Id.* at 2). The investigation documents also indicate that there were no issues of temperature in "one particular cell" as being different than the other cells on the unit.[37] (*Id.*) The CPCRC denied plaintiff's appeal. (*Id.* at 7).

Plaintiff's second grievance was filed on December 6, 2010, one month after his first grievance regarding the temperature and four days before he was moved to C-6. (Def.s' Ex. F at 2). Plaintiff states that no other inmate in D pod was complaining about the cold in his cell.[38] (*Id.*) On December 9, 2010, the grievance investigator stated that the temperature in plaintiff's cell had been "measured by maintenance" and was in "compliance." (*Id.* at 3). Once again, it was noted that plaintiff was attempting to get his cell moved closer to the television. (*Id.* at 5). Plaintiff's grievance was denied at the facility level and on December 14, 2010, was sent to the CPCRC. (*Id.* at

---

[36] Defendants have also filed a "Cell Movement Log," showing the dates that plaintiff was housed in a particular cell for the entire time that plaintiff was incarcerated at WCJ. (Def.s' Ex. H at 9). Plaintiff was only housed in D-11 for approximately one month. (*Id.*)

[37] The investigator also found that plaintiff did not like D-11 because it was further away from the television and from other inmates. (Def.s' Ex. E at 5).

[38] Specifically plaintiff stated: "I asks [sic] every inmate in D pod is they [sic] cell cold [sic] they tell me no and always tell me its [sic] cold in your cell I can feel it over here (meaning) out side of my cell . . . ." (Def.s' Ex. F at 2).

5, 6).  The appeal was denied. (*Id.* at 7).

On December 10, 2010, plaintiff was moved to C-6. (Def.s' Ex. H at 9). Plaintiff did not mention asking for an extra blanket until his third grievance, dated December 16, 2010, after he was moved from C-6 to C-10 on December 14, 2010 for disciplinary reasons. (Def.s' Ex. G and H).  In this grievance, plaintiff complained that when he got to C-10, at approximately 9:30 to 10:00 p.m., this cell was cold. (Def.'s Ex. G at 2).  Plaintiff stated that he asked Officer Jackson for an extra blanket, but the officer would not give him one. (*Id.*)  Plaintiff also claimed that C-10 was dirty, and that he asked to clean it, but was denied cleaning supplies.  Plaintiff stated in his grievance that the cell was "no were [sic] near clean," and that his sink and toilet water had been shut off. (*Id.*)

The grievance investigator indicated that he spoke with staff, and that plaintiff complained about the temperature in every cell. (*Id.* at 4).  The investigator also stated that second blankets were only issued if "medically necessary." (*Id.*)  It was later determined that this response was incorrect, and plaintiff was issued a second blanket according to the SHU rules, which provide for a second blanket to be issued during the winter months. (*Id.* at 3; *see id.* at 11 (SHU Rule #8)) (notation signed by Lt. Breeyear on December 28, 2010). (*Id.* at 3)  Plaintiff appealed the decision, without noting that the blanket issue had been resolved, and the appeal was sent to the CPCRC. (*Id.* at 6).

On February 2, 2011, the CPCRC asked the facility for more information,

explaining the denial of the extra blanket,[39] explaining why plaintiff's request for grievance documents was delayed, explaining why the request to clean his cell was denied, and why his cell did not have water. (*Id.* at 7). In response, Officer Jackson submitted a statement, explaining that plaintiff was moved from C-6 to C-10 because he was yelling at, and threatening, the inmates housed in the minimum security dormitory. (*Id.* at 8). During his deposition, plaintiff stated he never threatened other inmates, merely that he had a "verbally . . . disrespectful conversation with an inmate saying FU, A hole, and things like that to each other." (Pl.'s Dep. at 70). Although plaintiff stated that he was arguing with only one inmate, the fact that he was cursing at anyone justified moving him for disciplinary purposes.

Defendant Jackson further stated that plaintiff's belongings were moved from C-6 to C-10 while he was getting a haircut. (Def.s' Ex. G at 8). Defendant Jackson states that he inspected C-10 and found that it was clean. When plaintiff was escorted to C-10, he was agitated and continued to yell at inmates and officers. He then began to yell that he wished to clean his cell, but was told that the cell was checked and found clean prior to the move, and that while he was continuing to be disruptive, he would not be allowed to clean the cell. (*Id.*) Defendant Jackson states that a short time later, plaintiff asked to use a typewriter, but Sergeant Jamieson denied the request based upon plaintiff's disruptive behavior. (*Id.*) The shift log entry confirms that plaintiff's request for the typewriter at 9:30 p.m. was denied "for the night" because of

---

[39] Apparently the CPCRC was not aware that plaintiff was given an extra blanket long before the appeal was sent on January 3, 2011. Officer Jamieson stated that plaintiff was given a blanket on December 15, 2010, even before he filed the grievance on December 16, 2010. (Def.s' Ex. H at 13).

his disruptive behavior. (*Id.* at 10).

Sergeant Jackson stated at approximately 10:45 p.m., he noticed water running into the hallway in front of C-10. Plaintiff had plugged his toilet causing a flood in his cell and hallway. Officer Jackson contacted Sergeant Jamieson, who ordered that plaintiff's water be turned off "until further notice." (*Id.* at 8). The only reason that plaintiff's water was turned off was because he was flooding his cell with the toilet. The shift log entry confirms these statements. (*Id.* at 9). This response was even more reasonable, given plaintiff's conduct on December 12, 2010, which included flooding his cell by filling cups of water from his sink and throwing them under the door. (*See* Lascar Aff. ¶ 6). After considering the additional information, on July 27, 2011, the CPCRC denied plaintiff's appeal, noting only that the facility rules did not require medical approval for an extra blanket, and that the grievance coordinator either misunderstood the rules or lacked interest in addressing the grievance properly. (*Id.* at 18).

Plaintiff filed another grievance on December 17, 2010, relative to the move to C-10. In the second grievance he complained about his property, the cleanliness of the cell, and the water. (Def.s' Ex. H at 2). The grievance investigator interpreted the grievance as a complaint about moving plaintiff to C-10 while he was not present.[40] (*Id.* at 4). The grievance was denied because plaintiff had engaged in "uncooperative behavior," and housing assignments are at the discretion of facility staff. (*Id.* at 4).

---

[40] Plaintiff's belongings were presumably moved while he was not in his cell in order to avoid another incident like the one on November 10, 2010.

The CRCPC responded by outlining plaintiff's five separate issues and requesting additional information because "the grievance officer's response is illustrative of an incomplete understanding of the grievant's complaint and the range of subjects that are not grievable . . . ." (*Id.* at 7-8). The CRCPC then outlined the additional information that it sought. (*Id.*)

Defendants submitted the additional information as requested, including shift log entries from the date in question, reporting plaintiff's yelling threatening remarks to inmates in the minimum security dormitory, and indicating that he was moved to "limit his contact to min[imum security] inmates." (*Id.* at 10-12). Sergeant Jamieson submitted a statement, confirming that plaintiff was moved because of his disruptive behavior, his belongings were placed on the bunk, not on the floor, and the cell was clean. (*Id.* at 13). Finally, Sergeant Jamieson stated that the water to plaintiff's toilet was turned off because plaintiff flooded the cell. (*Id.*)

Sergeant Jamieson also stated that Sergeant Lascar had informed him on December 15, 2010, that plaintiff wanted an extra blanket, and that plaintiff was given the second blanket. Plaintiff advised Sergeant Lascar that "the grievance was over." Sergeant Jamieson also stated that plaintiff's drinking water was never turned off because the jail staff only has the ability to turn off the water to the toilet. (*Id.* at 13). Sergeant Jamieson did not recall plaintiff asking to have his water restored on December 18, 2010 because Sergeant Jamieson did not know that the water was off at that time. (*Id.*) At his deposition, plaintiff admitted that the water was turned on so that he could flush the toilet every couple of days. (Pl.'s Dep. at 63). Although he

states that he did not drink for a couple of weeks, there is no mention of drinking in his grievances. It would have been reasonable for plaintiff to have included that in one of his many grievances regarding these incidents. He would presumably have been able to drink at meals.

Sergeant Lascar also submitted a statement to the CRCPC. (*Id.* at 14). He explained the decision to move plaintiff to C-10 based upon his behavior. Defendant Lascar stated that he spoke with the minimum security inmates and with plaintiff and ordered them to stop yelling at each other. Although the minimum security inmates complied with this order, plaintiff would not be reasonable. (*Id.*) After considering the additional information, the CRCPC voted to deny plaintiff's appeal.

The Second Circuit has held that proof that an inmate was subjected "for a prolonged period to bitter cold" will raise a triable issue of fact relative to the objective prong of the constitutional analysis. *Gaston v. Coughlin*, 249 F.3d 156, 164-65 (2d Cir. 2001) (citing *inter alia Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (inmate deliberately exposed to bitter cold in his cell block for three months); *Wright v. McMann*, 387 F.2d 519, 527 (2d Cir. 1967)). However, summary judgment is appropriate when the inmate has not been exposed to bitter cold for "a prolonged period." *Louis-Charles v. Courtwright*, No. 9:11-CV-147, 2014 WL 457951, at *7-8 (N.D.N.Y. Feb. 4, 2014) (adopting Rep't Rec.) (sua sponte dismissing claims in which the inmate testified that on three occasions, he was subjected to cold conditions for, at most, ten hours) (citing *Trammell v. Keane*, 338 F.3d 155, 159, 165 (2d Cir. 2003) (plaintiff was deprived of his clothing and confined to his cell for a few weeks, but the

temperature was not such as to pose a threat to his health and safety of the sort that would prevent summary judgment in defendants' favor).

In this case, plaintiff was in the WCJ for approximately five months from July of 2010 until January of 2011. During this time, he was housed in various cells, all in the SHU. Plaintiff was moved to D-11 for the first time on October 30, 2010, and he only stayed there until November 4, 2010. He was moved to D-8 for "reorganization" purposes because prison officials needed D-11 for other inmates. He was then taken back to D-11 and remained there for approximately one month. He claims that D-11 was the only cold cell on the unit because he stated that none of the other inmates had trouble with the temperature.[41]

When he was moved to C-6 on December 10, 2010, he could not behave himself and was disruptive with other inmates, thus, he was moved to C-10. He then complained that C-10 was cold and dirty. Every time he was moved to a cell that he did not like, he complained about the temperature. The defendants have also shown that when plaintiff asked for a blanket, the request was initially denied, but he was ultimately given another blanket. The temperature in plaintiff's cell was checked twice by the maintenance department according to the grievance documents, and each time, it was noted that the temperature was in compliance with the proper standards. Plaintiff has not shown that he was subjected to "bitter cold" for a "prolonged" period of time or that the temperature in his cell posed a threat to his health. *See also Borges v. McGinnis*, No. 03 Civ. 6375, 2007 WL 1232227, at *5 (W.D.N.Y. April 26, 2007)

---

[41] In his grievance, plaintiff alleged that he asked "every inmate in D Pod." (Def.s' Ex. F at 2).

41

(an inmate may not establish a constitutional violation merely by showing that he was uncomfortably cold for a short period of time).

Finally, although plaintiff testified that he never flooded his cell, the unit log books contradict plaintiff's allegation. Plaintiff does not contest the accuracy or veracity of the log book entry that clearly shows that plaintiff's water was turned off "due to inmate flooding cell." (Def.s' Ex. H at 12). Plaintiff's conclusory allegations are insufficient to defeat the defendants' motion for summary judgment. *See Inesti v. Hogan*, No. 11 Civ. 2596, 2013 WL 791540, at *23 & n.39 (S.D.N.Y. March 5, 2013) (although it is unlikely that prison log books would reflect the wrongful denial of a constitutional right, plaintiff did not contest the accuracy of the log books, and his conclusory allegations were insufficient to defeat the defendants' motion for summary judgment), Rep't Rec. *adopted by* 2013 WL 5677046 (S.D.N.Y. Sept. 30, 2013); *Headly v. Fisher*, No. 06 Civ 6331, 2010 WL 2595091, at *4 (S.D.N.Y. June 28, 2010) (contemporaneous log book entries eliminate any genuine issue of material fact that plaintiff was not deprived of opportunities to shower or go to recreation while under keeplock status).

It has been held that chronic exposure to unsanitary conditions and prolonged cold may establish a constitutional violation. *See Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001). In *Gaston*, however, mice were constantly entering the cell, and for several consecutive days, the area in front of plaintiff's cell was filled with human waste, and sewage water, there were broken windows in Gaston's cell block, and despite numerous complaints, the windows were not fixed the entire winter, exposing

42

inmates to *sub-zero temperatures. Id.* In this case, as stated above, plaintiff was given an extra blanket; his cells seemed to be the only ones having a temperature problem (a highly unlikely situation);[42] and he admits that his water was turned on every couple of days so that he could flush the toilet.[43] Plaintiff alleges no ill effects as the result of the allegedly unsanitary or unhealthy condition of his cell.

Plaintiff's inconsistent allegations do not create material issues of fact sufficient to defeat defendants' summary judgment motion. *See Scott v. Harris*, 550 U.S. 372, 379-81 (2007) (when opposing parties tell two different stories, one of which is blatantly contradicted by the record evidence, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment)*; McKinney v. Dzurenda, supra*; *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much

---

[42] Defendant Jamieson states that "all WCJ housing units are controlled by central thermostat, which is regularly monitored by maintenance and set and maintained at temperatures prescribed by New York state law." (Jamieson Aff. ¶ 6). Thus, it is highly unlikely that only one cell on the unit was so unbearably cold.

[43] Defendants do not concede that plaintiff's water was turned off for an extended period of time. As defendant Jamieson stated, he did not recall plaintiff asking to have his water turned on December 18, nor was defendant Jamieson aware that the water was off because the jail staff did not have access to turn the drinking water off, only the toilet water. (Def.s' Ex. H at 13). In defendant Jamieson's affidavit, he states that as a result of plaintiff's repeated attempts to flood his unit, his water was turned off for short periods of time. During those *short* intervals, plaintiff could request to have his water temporarily turned back on by making this request to the corrections officer who was making rounds to allow him to use the facilities in his cell. (Jamieson Aff. ¶ 7). Defendant Dougherty's affidavit also states that plaintiff's water was never turned off for more than a few hours at a time, and was turned back on so that plaintiff could "use the toilet and/or drinking fountain under direct supervision." (Dougherty Aff. ¶7).

of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account"); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere  conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Thus, plaintiff's claim of cold and unsanitary cell conditions may be dismissed.[44]

### 2.    Shower

In his complaint, plaintiff alleges only that he was denied a shower once by defendant Rivers/Schuyler and Sergeant VanArnum. (Compl. ¶¶ 1-3 at 28 (top of page)).  At his deposition, plaintiff stated that he was not denied a shower "too many times." (Pl.'s Dep at 66).  Even assuming that plaintiff was denied the shower once, this circuit has rejected claims of shower deprivation, lasting up to two weeks. *See Williams v. Ramos*, No. 13 CV 826, 2013 WL 7017674, at *6 (S.D.N.Y.  December 23, 2013) (deprivation of shower for nine days) (citing *Banks v. Argo*, No. 11 Civ. 4222, 2012 WL 4471585, at *4 (S.D.N.Y. Sept. 25, 2012) ("[E]ven assuming prison officials denied Plaintiff shower access for the entire time alleged in his complaint-thirteen days-his claim still fails as a matter of law.") (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y.2003) ("[A] two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs.' ")).

---

[44] In any event, the only defendants that were involved in the plaintiff's challenged conditions of confinement were defendants Lascar; Jamieson; and Jackson.

The court notes that plaintiff's first grievance regarding shower privileges was dated December 16, 2010[45] and stated that "at or around 8:30 – 9:00 I ask [sic] the officer Ms. 'Rivers' can I get a shower." (Def.s' Ex. K at 2) (Dkt. No. 34-11). Plaintiff states that he was refused his shower because Sergeant VanArnum said that plaintiff was not getting anything. (*Id.*) Plaintiff stated that he had not had a shower in four days.[46] (*Id.*) Plaintiff's grievance was denied because he did not follow the SHU rules for requesting a shower which required plaintiff to be at his cell door at 8 a.m. to request a shower. (*Id.*) A copy of the SHU rules was included in the grievance documents. (*Id.* at 6). Rule No. 2 of the "Special Housing Rules for All Inmates" provides that "ALL INMATES WHO WISH TO SHOWER AND SHAVE WILL BE AT THEIR CELL DOOR AT **8 AM** AND REQUEST TO DO SO TO THE UNIT OFFICER." (*Id.*) (emphasis added). By plaintiff's own admission, he was half an hour late to request a shower, thus, even if defendant Rivers/Schuyler did deny plaintiff a shower, she did so according to facility rules.[47] Plaintiff's shower claim may be

---

[45] Plaintiff indicated in the grievance that the denial of the shower happened on December 15, but that he was not given the grievance form until the next day. (Def.s' Ex. J at 2).

[46] As stated above, the deprivation of a shower for up to two weeks has been rejected as the basis for a constitutional violation. Thus, defendant Rivers/Schuyler did not violate plaintiff's constitutional rights when she denied him a shower on December 15, 2010.

[47] On December 22, 2010, the same day as the law library incident described above, plaintiff filed another grievance regarding the denial of a shower. (Def.'s Ex. K at 2) (Dkt. No. 34-12). However, in that grievance, plaintiff admitted being late, but argued that he went to the law library and missed the shower call, not that he failed to get up in time. He stated that he had been told he would get the shower when he got back, but CO "Peck" and Sergeant "Little" "made a problem in the law library because I was right by the Facility Rules. . . ." (*Id.*) Plaintiff requested his shower if that was possible. (*Id.*) The grievance was denied at the facility level and ultimately on appeal to the Commission on Correction. (*Id.* at 4-7). It is clear from the documents that plaintiff concedes that he was not at his cell at the appropriate time in order to request the shower, and he then became

45

dismissed.  This is the only allegation remaining[48] against defendant Rivers/Schuyler,

and thus, the complaint may be dismissed in its entirety as against this defendant.

## V.   Religious Services

### A.   Legal Standards

The First Amendment guarantees the right to the free exercise of religion.

*Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood

to retain some measure of the constitutional protection afforded by the First

Amendment's Free Exercise Clause."  *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.

2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  The right is not

extinguished simply because the inmate is in SHU or keeplock. *Id.* (citing *Salahudin

v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993)).  However, the right "is not absolute or

unbridled, and is subject to valid penological concerns, including those relating to

institutional security."  *Johnson v. Guiffere,* 04-CV-57, 2007 WL 3046703, at *4

(N.D.N.Y. Oct.17, 2007).

To succeed on a claim under the Free Exercise Clause, the plaintiff must show

at the threshold, that the defendants' conduct "substantially burdens his sincerely held

---

disruptive at the law library causing the incident described above.  Clearly, the subsequent denial of a shower was justified under the rules and did not violate plaintiff's constitutional rights.  In any event, plaintiff did not challenge this denial in his complaint.

[48] At plaintiff's deposition, he testified that he was not sure why he sued Officer Rivers/ Schuyler. (Pl.'s Dep. at 99).  He stated that he thought he named defendant Rivers/Schuyler because she denied him the ability to type up a motion, and he could not recall whether she ever denied him a shower. (*Id.*)  The complaint does allege that this defendant denied him a shower on one occasion. Judge D'Agostino has dismissed any claims regarding access to courts.  Thus, any claim that Rivers/Schuyler denied plaintiff the ability to type a motion has already been dismissed, and I am recommending dismissal of plaintiff's shower claim.

religious beliefs." *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *See Walker v. Artus*, No. 9:10-CV-1431(MAD/DEP), 2013 WL 564909, at *8-9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin*, 467 F.3d at 274-75).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights.[49] RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord*, 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood*, No. 05–10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22,

---

[49] Plaintiff did not mention RLUIPA in his complaint. However, in his memorandum in opposition to defendants' motion, plaintiff has included a random article from "Wikipedia" discussing RLUIPA. (Pl.'s Ex. H) (Dkt. No. 37 at 45-50). Plaintiff does not make any arguments relative to this article. He only includes it as an exhibit with much of the article underlined, most of which has nothing to do with this case. However, in an attempt to interpret plaintiff's claims as liberally as possible, this court will also analyze plaintiff's religion claim under RLUIPA. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")).

2008); *Gill v. Defrank*, No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin*, 963 F. Supp. 2d 227, 230 (W.D.N.Y. 1997)).

## B.    Application

In this case, plaintiff can not establish the first prong of either the Free Exercise or the RLUIPA standard.  Plaintiff claims that on two occasions, he was denied the ability to attend a bible study class.  First, plaintiff never mentions what religion he follows.  While this is not conclusive, plaintiff also does not allege how this denial substantially burdened the exercise of his religion.  Plaintiff was incarcerated in WCJ from July of 2010 until late January of 2011, and he only complained of missing his bible study on two occasions, once on December 14, 2010[50] by defendant Hafner, and the second time on January 8, 2011 by defendants R. Minor and Lascar.  Neither defendant Hafner, nor defendant R. Minor recall denying plaintiff the ability to go to Bible Study on December 14, 2010. (Hafner Aff. ¶ 5; R. Minor Aff. ¶ 6).

The grievance plaintiff filed regarding the December 14, 2010 incident did not indicate which officer denied plaintiff the ability to attend Bible Study, and there is no indication that an investigation was conducted or that any officer was interviewed regarding the incident. (Def.s' Ex. L at 2).  Plaintiff was more specific in his second grievance and alleged that R. Minor and defendant Lascar denied plaintiff the ability to attend the Bible Study because it was considered "a program" and thus, plaintiff did

---

[50] Although the complaint states that the date of the first incident was December 19, 2010, the grievance plaintiff filed states that the date was December 14, 2010, and was filed on December 20, 2010. (Def.s' Ex. L at 2).  In this grievance, plaintiff never specified who denied him the ability to go to bible study.

not have to go. (*Id.* at 3). The only investigation document states that the grievance was denied because plaintiff caused a disturbance on the date in question. (*Id.* at 4). Although plaintiff's grievance was granted regarding this issue, it is not indicative of a constitutional violation on its own.

The court notes that, according to Officer Marion Bassett, plaintiff attended "WCJ's Bible Study Program" on December 5, 2010. (Bassett Aff. ¶ 3) (Dkt. No. 34-15). Officer Bassett remembers this because on his way back from bible study, plaintiff punched the window in front of the control room where Officer Bassett was standing "and then flipped [her] his middle finger," and yelled at her "'*you know where I live, come and get me.*'" (*Id.*) (emphasis in original).

The court will assume that plaintiff was denied the ability to attend Bible Study on two occasions. In *Gill v. DeFrank*, the court held, agreeing with those courts in the Second Circuit which hold,[51] that missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion. 2000 WL 897152, at *2 (citing *Troy v. Kuhlmann*, No. 96 Civ. 7190, 1999 WL 825622, at *15 (S.D.N.Y. Oct. 15, 1999); *Boomer v. Irvin*, 963 F. Supp. at 15). *See also Hanton v. Mathiau*, 29 F. App'x 772, 773 (2d Cir. 2002) (affirming district court granting summary judgment based on a denial of religious services on two separate occasions); *Smith v. Graziano*, No. 9:08-CV-469(GLS/RFT), 2010 WL 1330019, at *9 (N.D.N.Y.

---

[51] There is a split of authority regarding whether missing one religious service can be a substantial burden on an inmate's right to practice his religion. *Robinson v. Jimminez*, No. 08-CV-902, 2012 WL 1038917, at *6 (E.D.N.Y. March 6, 2012) (citing *Page v. Breslin*, No. 02-CV-6030, 2004 WL 2713266, at *6 (E.D.N.Y. Nov. 29, 2004) (citing cases)), *Rep't Rec. adopted*, 2012 WL 1039825 (E.D.N.Y. March 8, 2012).

March 16, 2010) (cancellation of two religious services which appeared to be isolated occurrences, rather than a systemic policy of denying religious services constituted a de minimis or insubstantial burden on plaintiff's ability to freely exercise his religion).

This court agrees that based on the facts in this case, plaintiff's inability to attend two bible study classes in the six months that he was incarcerated at WCJ did not substantially burden the ability to practice his religion. There is no indication that plaintiff was not able to study the bible on his own during the two incidents in question. Thus, plaintiff's first amendment claim, and to the extent the court reads a RLIUPA claim into the complaint, may be dismissed.

## VI. **Municipal Liability**

### A. **Legal Standards**

The court notes that Judge D'Agostino dismissed the "Washington County Sheriff's Department as a defendant in her July 16, 2012 decision and ordered the Clerk to replace the Sheriff's Department with "Washington County" in the caption of the complaint. (Dkt. No. 7 at 6 n.3). Judge D'Agostino also discussed the standard for municipal liability which requires that the municipality adopt a "custom" or "policy" which is the moving force behind plaintiff's constitutional violation. *Id.* at 5 (citing *Zappala v. Albicelli*, 980 F. Supp. 635, 639 (N.D.N.Y. 1997) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 659 (1978)). A municipality may not be held liable on the basis of respondeat superior alone, and a single incident alleged in a complaint, particularly if it involves only actors below the policymaking level, will not suffice to raise an inference of the existence of a custom or policy. *Id.*

(citing *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).  In addition, plaintiff may not simply allege that there was a failure to train municipal employees or assert in a conclusory manner that the municipality has a custom or policy. *Id.*

### B.    Application

Because this court has found no constitutional violations, there is no need to discuss municipal liability, and the complaint may be dismissed as against Washington County.  The court would note that plaintiff's assertions of "custom" or "policy" at the end of many of his claims were entirely conclusory.  *See e.g.* Compl. at 23, ¶ 5) (stating that it was the WCJ's "policy or custom regarding lack of basic necessities" that caused the violation of plaintiff's Fourteenth Amendment due process rights).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 34) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL REMAINING DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February 21, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge